IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| **Anthony Meyer,** <br> **300 M St., SW** <br> **Apartment N812** <br> **Washington, DC 20024** <br><br> **Plaintiff,** <br><br> v. <br><br> **DynCorp International, LLC.** <br> **1700 Old Meadow Road** <br> **McLean, VA 22102** <br><br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. _____ <br> ) <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiff Anthony Meyer brings this action against DynCorp International, LLC ("DynCorp" or "Defendant") to seek redress for willful violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*, as amended ("ADA").

DynCorp discriminated against Mr. Meyer, a highly skilled avionics technician, based upon his disability and/or perceived disability when it refused to provide him with any reasonable accommodations after he returned from medical leave, instead terminating Mr. Meyer because of his disability and/or perceived physical medical disability, and because he required a temporary accommodation. Specifically, Defendant terminated Mr. Meyer the same day that he returned to work from medial leave related to his cervical spine disease and during a meeting with management to discuss his needed accommodations. At the meeting, Defendant's management refused to discuss potential alternative accommodations prior to terminating Mr. Meyer and explicitly stated that he was being terminated because he did not provide a full duty

release, meaning a medical release certifying that he could return to the workplace, full-time without any medical restrictions, from his medical provider.  At the time of his termination, Mr. Meyer had been employed with Defendant for nearly fifteen years and had a long history of excellent performance.  Mr. Meyer seeks to recover all wages, employment benefits, or other compensation denied or lost due to DynCorp's violations, back pay, liquidated damages, compensatory damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and any other legal or equitable relief this Court deems just and proper to redress DynCorp's unlawful actions.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) as this matter contains a federal question.

2. This Court has personal jurisdiction over Defendant because Defendant has substantial, continuous, and systematic contacts with Maryland and Defendant's relevant acts and omissions occurred in Maryland.  Defendant operates an office in Maryland and is registered to do business in Maryland.

3. Plaintiff was employed at the Naval Air Station Patuxent River location of DynCorp, which is located in Patuxent River, MD.  Patuxent River is located in St. Mary's County which is governed by the Greenbelt division of the District Court of Maryland pursuant to Local Rule 501(4)(c). All acts and omissions complained of occurred in or failed to occur in Patuxent River, Maryland.  Accordingly, venue lies within this judicial district pursuant to 28 U.S.C. §§ 1391(a)(2) and (b)(1).

## PARTIES

4. Mr. Meyer is an adult resident of Washington, D.C.

5. At all times relevant, Mr. Meyer was an employee of Defendant within the meaning of the ADA.

6. Defendant is a Delaware corporation and is headquartered in Virginia.

7. At all times relevant, Defendant was a covered entity within the meaning of the ADA.

8. Defendant does business in Maryland.

9. Defendant is registered to do business in Maryland.

10. Defendant maintains offices in Patuxtent River, Maryland.

11. Defendant is a private military contractor that provides various services to the federal government, including providing aviation support to the U.S. Department of Defense at its Patuxtent River, Maryland location.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. On September 15, 2016, Mr. Meyer filed a complaint of discrimination with the U.S. Department of Labor for Office of Federal Contract Compliance Programs ("OFCCP").

13. OFCCP acknowledged receipt of Mr. Meyer's OFCCP Complaint on December 13, 2016.

14. On December 26, 2018, OFCCP issued a Notice of Results of Investigation, which articulated OFCCP's findings that "DynCorp discriminated against [Mr. Meyer] when it failed to engage in the interactive process in response to [Mr. Meyer]'s request for accommodation and subsequently terminated [Mr. Meyer]."

15. After issuing the Notice of Results of Investigation, OFCCP and DynCorp engaged in conciliation in an attempt to resolve Mr. Meyer's OFCCP Complaint.

16. After failing to resolve Mr. Meyer's OFCCP Complaint through conciliation, OFCCP issued to Mr. Meyer a Notice of Right-to-Sue.

17. The Notice of Right-to-Sue is dated September 3, 2019 and was received by Mr. Meyer through his representative on September 4, 2019.

## FACTUAL BACKGROUND

### Mr. Meyer's Employment with Defendant

18. Mr. Meyer began working for Defendant as a mechanic on December 30, 2001.

19. At the time of his hire, Mr. Meyer had just graduated with an associate degree in applied science specializing in aeronautics from Utah State University. Mr. Meyer had a license as an airframe and power plant mechanic issued by the Federal Aviation Administration.

20. Mr. Meyer was initially assigned to work at the United States Naval Test Pilot School hangar, located at Naval Air Station Patuxent River, as an aircraft mechanic.

21. Between 2006 and 2009, Mr. Meyer served in the Air Force National Guard and was on military leave of absence for one year during that time period.

22. Upon the completion of his military service, given his experience during his tour of duty, DynCorp reassigned Mr. Meyer to work in avionics. Thereafter, Mr. Meyer adjusted, repaired, and replaced the electrical systems on various aircraft, including the V-22, the OH-58C, TH-6B, and TH-57C.

23. Beginning in 2011, Mr. Meyer's work focused on avionics, or the electronic systems, for the TH-57C Sea Ranger ("TH-57C") helicopter.

24. The electrical systems that Mr. Meyer worked on in the TH-57C primarily included the radio communications, navigation, and GPS systems. Mr. Meyer was also responsible for the wiring for all instruments in the TH-57C.

25. Mr. Meyer, like other employees in avionics, rotated between the day shift and night shift every few months.  At all times relevant, the night shift supervisor of the avionics crew was Gail Miller and the day shift supervisors were Dan Reyes and Keith Zook.

26. At all times relevant to this Complaint, Mr. Meyer worked on the night shift, from 3:00 p.m. to 11:30 p.m.  The work was performed in a hangar where many other helicopters were located and being worked on simultaneously.

27. Mr. Meyer was very knowledgeable about the systems and aircraft that he worked on and he was highly regarded in his position.

28. At all times relevant, Mr. Meyer's performance was excellent.

29. Throughout his nearly fifteen-year tenure with Defendant, he never received a negative performance review.

30. Mr. Meyer was dedicated to his job at DynCorp and was proud of the work he and his colleagues performed.

31. Mr. Meyer intended work at DynCorp until his retirement.

### Mr. Meyer's Diagnosis of Cervical Spine Disease

32. On July 7, 2015, Mr. Meyer experienced severe head and neck pain, and he was rushed to the emergency room.

33. On July 13, 2015, Mr. Meyer's physician, Dr. Eric Berg, determined Mr. Meyer would need to take time off of work due to his medical conditions.  Mr. Meyer relayed the information to Amy DuLaney, Human Resources/Benefits Administrator for DynCorp.  Ms. DuLaney informed Mr. Meyer that he was approved for twenty-six weeks of leave pursuant to the disability benefits offered by Defendant.

34. By letter dated July 16, 2015, Ms. DuLaney informed Mr. Meyer that upon his return to work at the end of the twenty-six weeks, he would be required to "provide a full duty release certification."

35. On July 30, 2015, a different physician, Dr. Vinod Abraham, examined Mr. Meyer, reviewed his MRI results, and formally diagnosed him with cervical spine disease and osteophyte complex from C3-C4 and C6-C7 vertebrae.

36.  Cervical spine disease occurs when the space between the cervical discs narrows causing damage to the cervical discs.  Specifically, Mr. Meyer suffered from a narrowing of the space and desiccation in several of his cervical discs.  This resulted in disc bulging in some discs and protrusion or spur complexes in other discs.

37. Among other things, Mr. Meyer's cervical spine disease impacted his ability to walk, lift, bend, reach, and sit or stand for extended periods of time and the operation of his musculoskeletal system.

38. On August 6, 2015, Dr. Berg filled out a document entitled "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)."  Mr. Meyer provided the document to Ms. DuLaney.

39. The document Dr. Berg filled out on August 6, 2015 specified that Mr. Meyer's medical restrictions included restrictions on climbing, crawling, bending, kneeling, lifting more than five pounds, reaching overhead, flexing or extending the neck, sitting or standing more than thirty minutes.

40. The document also stated that Mr. Meyer suffered from "disc disease" and indicated that Mr. Meyer required further consultation with a neurologist and neurosurgeon.

41. Mr. Meyer began a twenty-six week short-term disability leave from DynCorp as a result of the medical condition described in the August 6, 2015 letter.

42. During this period, Mr. Meyer underwent various medical procedures and assessments, including CT scans, to diagnose his condition properly and determine the best method of treatment. Ultimately, Mr. Meyer's medical providers concluded that Mr. Meyer's condition could be treated with regular epidural injections in his neck, approximately twice a year.

43. Since that time, Mr. Meyer has continued to receive epidural injections but only requires the injections once every twelve to eighteen months.

## **Mr. Meyer's Termination**

44. On December 2, 2015, Ms. DuLaney informed Mr. Meyer, by email, that he must return to work by Monday, January 11, 2016, because his leave was set to exhaust on that date.

45. On January 6, 2016, Mr. Meyer underwent a medical evaluation, conducted by Certified Registered Nurse Practitioner ("CRNP") Mariesa Kinch at the direction of Dr. Joseph Ferraro.

46. Following the January 6, 2016 medical evaluation, on January 7, 2016, CRNP Kinch authored a medical note stating that Mr. Meyer could return to work on January 11, 2016 with the medical restrictions that he could not lift anything greater than or equal to twenty pounds and could not perform "overhead work at this time."

47. Mr. Meyer's medical providers informed him that he required the restrictions because he had recently received an epidural injection in his neck to treat his medical condition. The restrictions were required to allow Mr. Meyer to fully heal from the injection.

Accordingly, the restrictions would only be in place for one month following the injection in January 2016 and subsequently would be required for two weeks following each epidural injections, which, at the time, his medical providers estimated he would receive every six months.

48. Accordingly, by mid-February 2016, Mr. Meyer would have been able to perform his duties without any medical restrictions.

49. Upon his return to the workplace in January 2016, Mr. Meyer would have continued his work on the electrical systems of the TH-57C on the night shift under the supervision of Gail Miller.

50. Mr. Meyer is seventy-five inches tall or over six feet, two inches.

51. Due to Mr. Meyer's height, his work duties rarely required him to perform overhead work.

52. Mr. Meyer's work duties rarely required him to lift anything greater than or equal to twenty pounds.

53. The systems Mr. Meyer worked on are all located at, or below, Mr. Meyer's chest level when he works on them and therefore, would not have required reaching overhead.

54. Specifically, the radio communications and navigation systems are located in the center console and Mr. Meyer would have worked on those systems while sitting in the pilot or co-pilot seat located at the front of the helicopter.  When sitting in the front seats, the center console is located next to the knees.  Accordingly, Mr. Meyer needed only to reach down, not up, to perform work on the radio communication and navigation systems.

55. The GPS system is located in the forward cowling, above the cockpit.  All employees working on systems in the forward cowling were required to use a four-step ladder to reach it.  Mr. Meyer was chest level with the forward cowling on the second step of the ladder.  Accordingly, Mr. Meyer would not have been required to reach overhead to perform work on the GPS system.

56. For all other instruments that Mr. Meyer worked on, the relevant wiring was typically maintained in the same center console as the navigation and radio communications system and the wiring ran from the center console to the back shelf, located behind the back seats.  When sitting on his knees in the back seats, the back panel, which also housed wiring, was chest level with Mr. Meyer.

57. Accordingly, given the location of the equipment and parts that Mr. Meyer worked on, he could perform nearly all his duties on the TH-57C by standing or sitting without raising his arms.

58. The work performed on the electrical systems included troubleshooting and repair of the systems by splicing wires, crimping terminals, removing and installing instruments and gauges, cable wiring, and conducting general systems checks. Upon information and belief, the tools, equipment, or parts regularly used to perform maintenance, or repair work, on the TH-57C systems on which Mr. Meyer worked did not weigh over twenty pounds.

59. In fact, upon information and belief, most tools or objects required to perform the job weighed less than five pounds as Mr. Meyer was primarily handling very lightweight wires.

60. During the night shift, there are approximately twenty avionics mechanics, supervised by Gail Miller, and many other employees performing work on other parts of the helicopters located in the same hangar where Mr. Meyer worked.  There was at least one other employee assigned to perform work on the TH-57C.

61. Employees frequently assisted each other in the performance of their duties.

62. Had Mr. Meyer been required to reach overhead, or lift an object more than twenty pounds during the time period that he was restricted, which happened infrequently, a colleague could have easily assisted him.  Moreover, alternative accommodations could have been provided in the rare occurrences that Mr. Meyer needed to reach above his head.

63. Mr. Meyer reported to DynCorp's Human Resources Office on January 8, 2016 to request a reasonable accommodation once he returned to the workplace in the upcoming days and provided Mr. Ethrage Haggard, Human Resources Director, with the January 7, 2016 medical note in support of his request.

64. Mr. Haggard told Mr. Meyer that Terry Swift, the group manager, was the only person who could authorize the issuance of a reasonable accommodation for Mr. Meyer.  Mr. Swift does not participate in the day-to-day activities of an avionics mechanic and therefore, is not familiar with Mr. Meyer's specific job duties.  Similarly, Mr. Swift does not perform work on the TH-57C as part of his job duties and, therefore, is unfamiliar with specifics of the helicopter.

65. During that January 8, 2016 meeting with Mr. Haggard, Mr. Swift was not available.

66. Mr. Haggard instructed Mr. Meyer to return to DynCorp on Monday, January 11, 2016 to speak directly with Mr. Swift about his need for accommodations.

67. Following the January 8, 2016 meeting between Mr. Meyer and Mr. Haggard, Mr. Meyer provided the January 7, 2016 medical note to Ray Taylor, production manager, and Dan Reyes, day shift supervisor.

68. Both Mr. Taylor and Mr. Reyes told Mr. Meyer that they did not see a problem with his work restrictions and reasonable accommodation request given that the primary job duties could be completed without reaching overhead or lifting more than twenty pounds, but reiterated that the request required approval by Mr. Swift.  However, Mr. Taylor and Mr. Reyes expressed that they were looking forward to Mr. Meyer's return.

69. As instructed, Mr. Meyer returned to work on January 11, 2016 with a copy of the January 7, 2016 medical note supporting his requested reasonable accommodations.

70. When he arrived at the workplace, Mr. Meyer met immediately with Mr. Swift and Ms. DuLaney.

71. Mr. Meyer explained his request for a reasonable accommodation to Mr. Swift and Ms. DuLaney, including that it was temporary in nature and that he anticipated returning to work in a full duty status in one month.

72. During the meeting, Mr. Swift and Ms. DuLaney stated that they would not provide Mr. Meyer's requested accommodations, nor any accommodations, and that a release from his treating medical providers allowing him to return to work immediately in a full duty capacity, meaning full-time, without restrictions, was required.  Mr. Swift and Ms. DuLaney explained that because Mr. Meyer did not provide a full duty release, Defendant was terminating his employment.

73. During that January 11, 2016 meeting, neither Mr. Swift nor Ms. DuLaney discussed any other alternative accommodations, such as additional leave or job restructuring/modification, that would allow Mr. Meyer to perform his job duties.

74. During the January 11, 2016 meeting, neither Mr. Swift nor Ms. DuLaney analyzed Mr. Meyer's specific job duties or seek to determine the exact job-related limitations resulting from Mr. Meyer's disability.

75. During the January 11, 2016 meeting, neither Mr. Swift nor Ms. DuLaney sought to obtain any additional information from Mr. Meyer regarding the nature of his medical condition or the resulting limitations.

76. DynCorp's "Exit Interview Form," signed on January 21, 2016, lists the reason for Mr. Meyer's termination as "Exhausting 26 weeks of LOA."

77. The effective date on the Exit Interview Form was January 8, 2016.

78. January 8, 2016, was three days prior to Mr. Meyer's leave exhaustion date and the same day that Mr. Meyer requested a reasonable accommodation.

79. At the time Defendant terminated Mr. Meyer's employment, it had failed to consider reassignment as a possible reasonable accommodation.

80. At the time of his termination, vacant funded positions existed at DynCorp for which Mr. Meyer could have performed the essential functions with reasonable accommodations.

81. At the time of his termination, vacant funded positions existed at DynCorp for which Mr. Meyer could have performed the essential functions without reasonable accommodations.

82. For example, in January 2016, a tools and parts attendant position, which had no requirement to reach overhead or lift more than twenty pounds, was vacant. However, Defendant did not consider reassigning Mr. Meyer to the tools and parts attendant position.

83. On or around February 2, 2016, Mr. Meyer's physician provided him with a medical note indicating that he could work four hours a day for two weeks "then if no exacerbations of pain with daily duties, he can then resume full time status."

84. Mr. Meyer provided the February 2, 2016 note to DynCorp but DynCorp refused to reverse its decision regarding Mr. Meyer's termination.

85. On February 16, 2016, approximately one month after Mr. Meyer sought to return to the workplace with minimal restrictions, Mr. Meyer's physicians cleared him to return to the workplace in a full-duty status, as Mr. Meyer had indicated to Defendant would happen.

### COUNT I: TERMINATION OF EMPLOYMENT ON THE BASIS OF DISABILITY AND PERCEIVED DISABILITY, IN VIOLATION OF THE AMERICANS WITH DIABILITIES ACT (ADA), AS AMENDED

86. Plaintiff incorporates the allegations contained in all preceding paragraphs as if stated herein.

87. Plaintiff was, at all times relevant to this matter, and employee of Defendant under the ADA.

88. Defendant was, at all times relevant to this matter, an employer of Plaintiff for the purposes of the ADA.

89. Plaintiff was a qualified individual with a disability within the meaning of the ADA.

90. Plaintiff suffers from cervical spine disease, which substantially limited several major life activities including his ability to lift and reach and the operation of his musculoskeletal system.

91. Plaintiff was qualified to perform the duties of avionics mechanic and he could have performed the essential functions of his position with a reasonable accommodation. Specifically, Plaintiff could have performed the essential functions of his position with accommodations such temporary limitations on tasks that required reaching overhead and lifting more than twenty pounds, job restructuring/modification, job reassignment, or one month of additional leave.

92. At the time of his termination, Defendant was aware of Plaintiff's disability.

93. Plaintiff's termination was effective three days before his leave was to exhaust.

94. Defendant explicitly stated the reason for Plaintiff's termination was because he did not provide a medical release to return to work in a full-duty capacity without any medical restrictions.

95. Before terminating Plaintiff, Defendant did not engage in the interactive process or consider any alternative accommodations for Plaintiff, including reassignment, job restructuring/modification, additional leave, or temporary assistance with rare tasks that required him to reach overhead or to lift over twenty pounds.

96. These acts constitute a violation of the ADA.

97. As a direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life and other pecuniary and nonpecuniary losses within the meaning of 42 U.S.C. § 1981a.

98. Defendant's actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

## COUNT II: DENIAL OF REASONABLE ACCOMMODATION IN VIOLATION OF THE AMERICANS WITH DIABILITIES ACT (ADA), AS AMENDED

99. Plaintiff incorporates the allegations contained in the preceding paragraphs as if stated herein.

100. Plaintiff was, at all times relevant to this matter, an employee of Defendant under the ADA.

101. Defendant was, at all times relevant to this matter, an employer of Plaintiff for the purposes of the ADA.

102. Plaintiff suffers from cervical spine disease, which substantially limited several major life activities including his ability to lift and reach and the operation of his musculoskeletal system.

103. Plaintiff was qualified to perform the duties of avionics mechanic and he could have performed the essential functions of his position with a reasonable accommodation. Specifically, Plaintiff could have performed the essential functions of his position with accommodations such as temporary limitations on tasks that required reaching overhead and lifting more than twenty pounds, providing assistance for the limited tasks that required him to reach overhead or lift more than twenty pounds, job restructuring/modification, job reassignment, or approximately one month of additional leave.

104. Plaintiff put Defendant on notice of his disability and need for an accommodation. For example, Plaintiff requested an accommodation that he temporarily avoid reaching overhead or lifting more than twenty pounds and provided medical documentation in support of his request.

105. Providing Plaintiff an effective reasonable accommodation would not have posed an undue hardship on Defendant.

106. Defendant failed to engage in an interactive process, including failing to inquire about the nature of the limitations resulting from Plaintiff's medical condition and failing to consider alternative accommodations such as job restructuring/modification or additional leave.

107. Defendant also made no efforts to determine whether any vacant position existed to which Plaintiff could be reassigned, which Plaintiff could perform the essential functions of that position with or without reasonable accommodation.

108. Alternative accommodations, including a vacant position for which Plaintiff was qualified or additional leave, were available at the time Defendant terminated Plaintiff. Providing Plaintiff with an alternative accommodation would not have posed an undue hardship on Defendant

109. Instead, Defendant required Plaintiff to provide a documentation that he could return to work immediately in a full-duty status, without an accommodation, and terminated him because he did not.

110. Defendant failed to provide Plaintiff with a reasonable accommodation and failed to engage in the interactive process with Plaintiff and/or his physicians to determine an appropriate and reasonable accommodation for Plaintiff as required by law.

111. These acts constitute a violation of the ADA,

112. As a direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other pecuniary and nonpecuniary losses within the meaning of 42 U.S.C. § 1981a.

113. Defendant's actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

## COUNT III: RETALIATION IN VIOLATION OF THE AMERICANS WITH DIABILITIES ACT (ADA), AS AMENDED

114. Plaintiff incorporates the allegations contained in the preceding paragraphs as if stated herein.

115. Plaintiff was, at all times relevant to this matter, an employee of Defendant under the ADA.

116. Defendant was, at all times relevant to this matter, an employer of Plaintiff for the purposes of the ADA.

117. Plaintiff suffers from cervical spine disease, which substantially limited several major life activities including his ability to lift and reach and the operation of his musculoskeletal system.

118. Plaintiff was qualified to perform the duties of avionics mechanic and he could have performed the essential functions of his position with a reasonable accommodation. Specifically, Plaintiff could have performed the essential functions of his position with accommodations such as temporary limitations on tasks that required his reaching

overhead and lifting more than twenty pounds, job restructuring/modification, job reassignment, or one month of additional leave.

119. Plaintiff engaged in protected activity when he requested reasonable accommodations, including in January 2016 when he provided medical documentation indicating that he could return to work but could not reach overhead or lift more than twenty pounds and requested accommodation from several management officials on multiple occasions.

120. Plaintiff also engaged in protected activity when he availed himself of the leave provided by Defendant as an accommodation.

121. Defendant terminated Plaintiff the same day that he met with management to discuss his requested accommodations and Defendant identified the effective date of the termination as three days earlier, the same day that Plaintiff provided a medical note supporting his accommodation request, rather than the day that his granted leave would have been exhausted.

122. Plaintiff's notice of termination cites "Exhausting 26 weeks of LOA" as the reason for his termination, but was designated as effective several days before Plaintiff actually exhausted his leave.

123. These acts constitute a violation of the ADA.

124. As the direct and proximate result of the acts and omissions of Defendant as described above, Plaintiff suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other pecuniary and nonpecuniary losses within the meaning of 42 U.S.C. § 1981a.

125. Defendant's actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**WHEREFORE,** Plaintiff prays that this Court:

a. Grant judgment in his favor against Defendant;

b. Grant him declaratory and injunctive relief, including but not limited to reinstatement to the position with the Defendant that he previously held;

c. Enter an award of back pay, in the amount of any wages, employment benefits, or other lost compensation, interest on back pay, and compensation for any special damages sustained as a result of the Defendant's unlawful actions;

d. Enter an award of compensatory damages in an amount to be shown at trial;

e. Enter an award of punitive damages in an amount to be determined at trial;

f. Enter an award of reasonable litigation costs, expert fees, and attorneys' fees;

g. Grant him such other and further relief as justice may require.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and pursuant to the local rules of this Court, Plaintiff hereby demands a trial by jury.

Respectfully submitted,

*/s/ Cori Cohen*
_____
Cori Cohen, Bar No. MD19124
Gary M. Gilbert, Bar No. 15808
Attorneys for Plaintiff
Gilbert Employment Law
1100 Wayne Ave., Ste. 900
Silver Spring, MD 20910
Telephone: 301-608-0880
Facsimile: 301-608-0881
Email: ccohen@gelawyer.com
       gary@gelawyer.com